## LAMBETH *v.* THE STATE, 23 Miss. Rep., 322.

### HOMICIDE.

The guilt or innocence of the accused is in no degree dependent upon the question of his or the deceased's title to the land or fence, which had caused the dispute between them and ended in the killing of deceased.  If either killed the other with a deadly weapon in order to prevent a trespass in the removal of the fence, such homicide would be murder in the absence or proof that would tend to rebut the presumption of malice arising from the weapon used.

The competency of dying declarations is exclusively for the consideration of the court, and having once decided on its competency, it then becomes the province of the jury to decide upon its credibility, who are at liberty, in doing so, to consider all the circumstances under which they were made, and give to the evidence only such merit as they may think it deserves.

Where the court has admitted the dying declarations as competent evidence for the jury, the law raises a presumption that they were made by the party under a due sense of impending dissolution.

It is proper for the court to modify instructions as asked by counsel, so as to make them conform to his own views of the law, yet, it is the safer rule, to give instructions as asked by the accused, provided the court believes them to be the law, and if any explanations are necessary, to give them afterwards.

Objections to the admission of dying declarations must be made on the trial; it is too late to object on error.

The Bill of Rights, which declares that "the accused shall be confronted by the witnesses against him," does not apply to the admission of the dying declarations of the deceased, in cases of homicide.

Dying declarations are not entitled to the same degree of credibility, as if the deceased had sworn to the same facts in open court, as a witness; and an instruction to that effect is erroneous.

Lovick Lambeth, the plaintiff in error, was indicted and arraigned before the Madison Circuit Court, for the murder of John Tate.   A change of *venue* was granted, and he was tried

and convicted at the November term, 1850, of the circuit court
of Yazoo county, of the crime alleged.

It may be proper to state that Lambeth was indicted jointly
with Isaac and James Mayfield, who were acquitted.   Lambeth
fled, but came back and took his trial separately.   Darling Rol-
lins, first witness, testified that he had known Tate fifteen years,
was hired by Tate, and worked for hire, at fifty cents a day, on
the 4th March, 1850.   On the morning of that day, Tate told
witness to take the negroes, and reset a fence then in dispute be-
tween Tate and Lambeth, beginning at the east end of the line,
and northeast corner of the Shular field.   He ran the fence for
some distance westward, and then ran it south, below witness'
house.   After breakfast, Tate came out where he was, with a
double-barrelled shot gun.   Witness said if he had come sooner,
he would have had a chance at some partridges.   Tate made no
reply.   Witness and Tate were at the south-west corner of the
Shular field, and just then Lambeth passed, going towards Can-
ton.   He told Tate he had forbade his moving the northern string
of fence.   Tate said, "Pass on, I want nothing to do with you."
Lambeth said he was going to Canton, and would stop Tate be-
fore night, and passed on, turning to the right around the field,
and went back through the woods, in the direction of his own
house.   Witness told Tate he had better go home; he said he
would not, that he would not interfere with Lambeth.   Witness
urged him, saying some devilment was going on, and he thought
Lambeth would shoot him.   Soon he heard guns firing, and caps
bursting, in the direction of Lambeth's house, which was about
five hundred yards from the field; thought he heard three guns
fire.   Witness was putting up stakes; said to Tate, "Yonder
comes a crowd of them now;" they were in full view up the
road, and coming down to the mouth of the lane, towards me
and Tate.   Don't know that Tate turned his head.   Just then
Magruder rode up.   Witness begged him to stay, that he feared
a difficulty, but he would not.   Lambeth and the Mayfields
neared the mouth of the lane; Lambeth turned off there, and
went towards the north-east corner of the field, where the negroes
were moving the fence, and the Mayfields came down the lane
where witness and Tate were; they, starting to the negroes, met

the Mayfields at witness' house. Tate shook hands with one or both; they appeared friendly. Israel said to Tate, "What in the devil is all this fuss about?" Tate said, "Nothing only that fence," pointing to it; that he never did Lambeth any harm, or said anything against him. They stepped into witness' yard; his wife called him, and told him to keep out of any difficulty. Said he must do his work. At this moment heard Tate say to the Mayfields the line had been correctly run. Witness talked to his wife some time, Tate and the Mayfields going towards the fence in a line east of north; they walked eighty yards; Tate turned and waved his hand to witness, as if calling him, but Tate and the Mayfields continued their direction some thirty yards further. Tate again beckoned to witness, who was at his house. Witness went and came up to them as they were crossing a drain, two hundred and fifty yards from the house. As they crossed it, the Mayfields turned rapidly off to the left. Tate kept up the drain towards the negroes. Witness turned to the left also, not comprehending the movement of the Mayfields; Tate walked some forty yards up the drain; saw Lambeth step from behind a tree, and ask Tate what he wanted. Tate said, "Nothing from you, Lambeth." Lambeth said, "D——n you, I'll shoot you," and raised his gun; Tate wheeled to the left, and made for a tree they had passed, but Lambeth fired on him before he succeeded. Tate had his gun in the hollow of his left arm, and right hand on the breech, when shot. One of the Mayfields, when he was shot, said, "There, by God, Tate drew his gun first!" but he did not. Lambeth was about to fire again; witness raised his hand, and said, "Don't, you have killed him." When Tate was shot, he tried to shoot at Lambeth, but could not; walked a few steps, tried again, and failed. Witness was five steps from the Mayfields, about twenty-five from Tate, and the same from Lambeth, when the shooting happened. Tate walked about fifty yards and fell. Witness asked for help of the Mayfields, who refused it, and went to and off with Lambeth. Lambeth stood behind a tree about two feet through, the largest about; no obstruction between Lambeth and Tate when Lambeth fired, or between Lambeth and the path up which Tate had come. An ignorant negro carried Tate's gun home; did

not know how to let a hammer down; examined in the evening; found both hammers down, a cap on the gun. This was 4th March, 1850, eight or nine o'clock A. M. On the 26th February, 1850, Lambeth came to the field; said what sort of writing was that he sent him? Tate said, "Such as I wanted; Lambeth, you old devil, did you think I would receive such a small sum of money?" Tate was moving a tree cut on his land, but part of it had fallen on Lambeth's land. Lambeth forbade him. Tate said, "Ill do it or die;" fastened a chain to it, and told his negro to drive on. Lambeth drew his gun and threatened to shoot. Tate said, "Shoot and be d——d!" and walked off, when Lambeth said, "You old devil, I'll get you in a few days."

Cross-examined.—Witness reproved Lambeth, who said he had no idea of shooting Tate. Tate told witness that county surveyor had run a line, and the fence was on Lambeth's land, but he did not believe it, as one Gillespie run the line in 1837, but it was on his land. The evening of the shooting, witness gave a negro woman a six-barrel revolver; did not belong to him, but found it in his trunk. Saw Lambeth some moments before Tate was shot; don't know that Tate saw him. Saw Tate going towards Lambeth in speaking distance; did not warn him of danger; formerly told Tate Lambeth would shoot him, as he "saw shoot in his eye," the 26th February. Tate did not cock his gun or present it at Lambeth when he was shot.

Rev. Thomas McGruder.—Says a portion as Rollins; Tate said he would have difficulties about his road; asked him to stay, but he would not. Tate said he must do then the best he could, but he could not be run off his own land. Witness rode on towards Canton; soon reached an eminence; looked back; corroborates Rollins down to his, Tate's and the Mayfields' reaching Rollin's house. Witness then went on; heard gun fire; turned back toward the Shular field; saw three men enter the road going from where he found Tate's body; heard a female cry for help; started to the house, met Rollins and some negroes; said Tate was shot, Rollins was excited; told Rollins 'twas no use to send for help; proposed to go and see Tate; found him pale, ghastly, and weltering in his blood; thought him dying;

had some religious conversation ; asked him what was the matter ?   Said " Lambeth had shot him ; that he made no effort to shoot Lambeth till he shot him ; " fainted, thought him dead ; revived.   Soon Esq. Carstarphen came, and soon we called some wagoners to help us ; asked them where they lived, that they might be needed as witnesses ; did not hear a conversation between Tate and Carstarphen, as stated by the latter, but such might have been and he not hear it, while he was talking to the wagoners ; found no gun near Tate when he came to him ; soon took Tate to the house, when he left.

Carstarphen says, on March 4, 1850, met four men, Lambeth, the two Mayfields, and another, where a road meets the main Canton road at right angles, walking fast.   Lambeth said, " Good morning, squire."   Heard a woman cry " Stranger ;" said Lambeth had shot Tate ; asked aid.   Went back to where he saw Lambeth and the Mayfields, round the north string of fence ; came up to Tate ; badly hurt, thought mortally.   Tate fainted. Came to, and made this statement, that he did not know Lambeth was there till he poked his head from behind a tree, and said, " Stop ;" that he dropped his gun.   Lambeth : " What will you have of me to-day ?"   Tate : " Nothing from you."   Lambeth ordered him again to stop, and shot him.   Tate said this before and after he fainted ; McGruder and Rollins were there at the time.

Dr. P. O'Leary.—Says he is a regular M. D. ; describes Tate's wounds.   All came in the direction from the right side of Tate ; of these he died.   Those under the arm would have struck the arm had it been down ; but if Tate was running or walking rapidly, they might have missed the arm.   Range of wounds from right side to spine.   His statements corroborated by several witnesses.

Jonathan Coleman.—Says he was on his way to Canton, on the morning of the 4th March, 1850.   Passed Lambeth's house short distance ; was hailed by Lambeth, who was going towards his own house, and was some fifteen or twenty steps from the road when he hailed.   Stopped, and asked Lambeth if he was going to town.   Said no ; that Tate was moving his fence, and he was going to get the boys and stop him.   Lambeth said Tate

had cocked his gun on him in the lane, and seemed to be excited.

Mrs. Mary Rollins states in substance as D. Rollins. When Tate waved his hand to Rollins, he was on the side of the drain next the house. Tate then had his gun on his right shoulder, and also when he passed her house. Heard gun fire; ran out; saw Rollins beyond drain, his hand raised; did not hear him say anything. Shortly saw Lambeth and the Mayfields start from the outside of the fence, in the direction towards the main Canton road. Cross-examined, and said that at her house she heard Tate tell the Mayfields "The line was correctly run." Did not hear the Mayfields propose to get the county surveyor to run it again. Day windy and blustering; but thinks she would have heard it. She could, though she might not hear. She then corroborates the first part of Carstarphen's proof, on cross-examination. Saw Tate's woman with pistol; laid it on her bed; made her put it into a trunk to be out of reach of the children. Supposes she got it out of Tate's clothes the day he was shot.

Thomas H. Gillespie says he was county surveyor in 1837 and '38. State asked if he then run a line between Lambeth's and Tate's land. Before answer, defense asked him if he had any personal knowledge of the length of the lines run by him in the survey. He said, no; except as he learned from his chain-carriers, who were sworn. He did not know that they made true or false report of the distances. Defense then objected to his proof; overruled, and exception taken. States how and when he made his survey. That Tate called on him "last Spring," (i. e., 1850,) to get the county surveyor, and run the line. Tate said he had no confidence in Holliday's survey. Witness then retraced his old lines, and found the disputed fence on Tate's land. That Shular, who once owned Tate's land, put up the fence from rails off of Tate's land. Witness stated these facts after Rollins had been cross-examined.

Several witnesses then said Tate fired a gun like most men, the butt to his right shoulder, his left hand on the barrel, and his right on the trigger. Tate was a peaceable man, but a brave and determined one, where he thought his rights were involved.

John Simms says he was with Tate the day he died, April 3,

1850. Was in full possession of mind, and satisfied of approaching death, and while so situated made a declaration, which is in substance as follows, as it was taken down in writing at the time by the witness :

" I sent Rollins to move the fence; while so doing, Lambeth came by and passed me, turned, and asked me if he did not tell me not to remove those rails. I said I had moved part, and would move the rest. He swore he would put me up for it; would put me in the penitentiary; that he was going to Canton to do it; passed on, turned at the forks of the road, and at the house rounded the fence, leaving the field on the right, and went home ; then heard caps bursting, guns firing, and concluded he was preparing for me. During this time I was staking for the negroes to put up the rails, and was nearly done, when I saw Lambeth and the Mayfields coming down the road. McGruder came up, pointed out the men to him; told him Lambeth had his gun; asked him to stay; he would not. Asked Rollins to stick by me, but he said he would have nothing to do with it. Went towards negroes; met the Mayfields, friendly, shook hands. They asked what had got into me and Lambeth. Said I did not know; had never said a harm word about Lambeth. They said it could be settled without going any further. I said I did not know how. They talked on the same way. James asked me to give up my gun. I said ' not to a crowd that was after me.' He said, if I would, Israel would go and get Lambeth's. I said if they wanted it settled, they ought to have taken Lambeth's gun before he came up; that I was certain not to meddle with him when he had no gun. Thus talking, we went towards my hands, I suspecting Lambeth was there, but not seeing him. Then we crossed the drain; the Mayfields stepped quickly off to the left; I halting, not understanding their movements. Lambeth spoke from behind a tree, asked what I wanted. I looked up, saw he had his gun drawed; told him I would have nothing from him. He told me not to come any further, or he would kill me. I looked around, saw an old tree, tried to get behind it; he shot me before I succeeded, and got behind the tree again. 3d April, 1850.—Wednesday evening, fifteen minutes after three."

Witness said Tate shot as other men; describes the usual mode. Saw Tate's gun, after he was shot, with hammer down. Cross-examined, and said Tate died at half-past five that evening. That early on 4th March, Tate came to his house with a double-barrel gun, and procured witness to load and charge it with great care; so much so, that he asked if there was any further difficulty between him and Lambeth. He said no. After standing and talking some time, Tate started off, saying he intended moving that fence that day.

Israel P. Mayfield, for defense, says, he and his brother James were at the shop "when they received some information from their mother, which caused them to go straight to Lambeth's house." Met him between his yard and gate with his gun; asked him what was the matter; Lambeth said he had started to Canton, found Tate's hands removing his fence; forbade it. Tate cocked his gun, told him to pass on; wanted to talk to Tate, but was afraid to stop; Tate looking as if he would shoot him off his horse if he did; said he intended to stop the removal; asked Lambeth to leave his gun; he said Tate had a gun, and he was not safe without his, but he would not shoot Tate for a million, the world, and would not go in shooting distance of Tate; asked witness to say so to Tate, and settle the difficulty. They went up to the mouth of the lane. Lambeth then asked them to go up the road to Tate and settle the difficulty, to tell him if he would put down his gun, he would his, to meet and settle it by words; if not, then fight it out, "fist and skull." Lambeth said he would go on to where the negroes were at work and stop them. They, Israel and James, went on and met Tate at Rollins' house; shook hands friendly. Witness said, "What the devil is this fuss about?" Tate said, "Nothing much, except that fence," pointing to it. Witness proposed to get the surveyor and have the line run, and thus settle it. Tate said, "The fence was his; he would remove it that day or do worse." The line had been correctly run. All, Tate, Rollins, witness, and James, had stepped into Rollins' yard, whose wife called him. They passed on, Tate leading the way. As they passed the house corner, witness said, "Mr. Tate, for God's sake, stop; don't go where Lambeth is. Yonder he

stands with his gun ; you see him as plain as I do," and pointed to Lambeth. Tate said, "He didn't care where Lambeth was, or what in the h—ll he had." They then walked on some seventy or eighty yards towards Lambeth. Tate stopped, and beckoned Rollins on. Witness told Tate that Lambeth had told him to tell him to put down his gun, and he would his ; that he would not shoot him for the world ; to meet and settle it without guns ; if not, to settle it "fist and skull." Witness asked Tate to put down his gun, and Lambeth would his. Tate said he would not put down his gun to settle a difficulty with any man. James proposed to Tate to give up his gun, and witness said, "Yes, Mr. Tate, do so ; if you don't want to give it to James, call your overseer and give it to him, and I will go and get Lambeth's gun, and carry it three hundred yards off, and go clear off." Tate said, "he did n't care what Lambeth did with his gun ; that he would not give up his gun to settle a difficulty ; that he carried his gun to settle it, and with his gun he would settle it." During this they halted, Tate beckoned Rollins on, who was sixty or seventy yards off. Tate started on, cocked his right hand barrel ; told witness and James to walk on ahead of them. We turned a little to the left—all crossed the drain nearly at the same time, a few feet below Tate. We were half way between Rollins' house and the drain at the second halt, when Tate cocked his gun. After crossing the drain, Tate did not halt, but turned to the right in a different direction from Lambeth, and towards his negroes. Witness went on the way they were walking, which led to Lambeth. Tate went up the drain towards his negroes, and eight or ten steps till he found a tree, cocked his other barrel, carried it presented, and seemed to keep the tree between him and Lambeth. As he reached it, believes he rested his gun by the left hand side of the tree. Lambeth told him to stop ; not to come on further till he told what he wanted. Tate asked Lambeth what he wanted. Lambeth said, "Nothing with you, Tate." Lambeth then asked Tate what he wanted. Tate said, "Step out from behind that tree and I'll show you what I want." Tate then seemed to be drawing back his gun, as if to place it on the other side of the tree ; took a step or two backwards, and turned as if stepping to the

other side of the tree, and, in so doing presented his right side
to Lambeth, who shot him.   For the time witness left Rollins'
house till Tate put his gun by the tree, Lambeth stood lean-
ing his left side against the tree, leaning his gun butt on the
ground.   He then picked up his gun, stepped behind the
tree, and fired from the other side.   Tate presented his gun
first.   It is one hundred and twenty or thirty yards from
where Tate passed the drain to where Lambeth was standing.
Tate told witness that all, save a few panels of fence, was
on Lambeth's land.   Witness is brother-in-law of Lambeth,
indicted for the same offense, and acquitted.   Denies that he or
James said "There, by God, you see that Tate drew his gun
first," or such like words, as Lambeth fired.   Says Rollins was
not over the drain when Lambeth fired.

James Mayfield corroborated Israel.

John Simms stated that the surveyor of Madison ran the
line between Lambeth and Tate, at their request.   Lambeth,
Tate, and witness carried the chain.   By it the fence half way
was entirely on Lambeth's land when it struck the line, and run
upon it at the rail top to the end of the line.

The state then called John Henry, S. G. McGruder, wagon-
men, B. Sutherland, Montgomery, Hicks and Phil. Rayford;
all of whom said, from the general character of the Mayfields,
known to them, they would not believe them on oath, and had
come to this opinion since the killing.

The defence then called Bowman and twenty-four others, who
deposed to the exact contrary, and would not believe them on
oath.

The following are the instructions asked by the counsel for the
state:

1st. That every killing is presumed malicious, and is murder,
unless the contrary is proven.   (Granted.)

2d. Malice is presumed, from the use of a deadly weapon.
(Granted.)

3d. If there is premeditation, however short, the killing is
murder.   (Granted.)

4th. If Lambeth designed killing Tate for moving the fence,

and Tate died of his wounds, it is murder, unless done in self-defense.

5th. Lying in wait and threats, are evidence of malice express, previous, and defendant must disprove them. (Granted.)

6th. Although Tate might be wrongfully removing the fence, it did not justify his killing, and, if killed in pursuance of a design, it is murder. (Granted.)

7th. The jury can compare and weigh testimony, and give it such weight as they may deem it entitled to. (Granted.)

8th. The statements of accused are evidence, but the jury may give them such credit as all the facts and circumstances of the case show them to be entitled to. (Granted.)

9th. The dying declaration is entitled to the same verdict as if sworn to in court. (Granted.)

10th. Refused, and qualified as below.

11th. The declaration is presumed to be made under a "solemn and religious sense," unless the contrary is shown. (Granted.)

Defendant objected to the 7th, 9th, 10th, and 11th charges. The defendant asked seven charges; four were given, three were refused, and those were,—

Charge 4. A long hypothetical string of supposed facts, not in evidence, and conclusions therefrom. (Refused.)

Charge 5. Refused, as asked, and given as qualified below.

Charge 6. Refused, as asked, and given as qualified below.

Qualification of defendant's 5th charge :—In considering the dying declarations of Tate, the jury may take into consideration the condition of the deceased, his state of mind, and all the circumstances by which he was surrounded at the time such declaration was made.

Qualification of state's 10th, and defendant's 6th charge :—To warrant the jury in finding the defendant guilty, there should be evidence before them to satisfy their minds beyond a reasonable doubt. That which amounts to mere possibility only, or to conjecture, or supposition, is not what is meant by reasonable doubt. The doubt which should properly induce a jury to withhold a verdict of guilty should be such a doubt as would reasonably arise from the evidence before them ; and if such reasonable

doubt should arise from the evidence, the prisoner should have the benefit of that doubt.

The jury found Lambeth guilty. A new trial was moved for, because,

1. Illegal testimony went to the jury.

2. The 7th, 9th, and 11th charges were not law.

3. The 4th, 5th, and 6th defence charges were refused.

4. The verdict was contrary to the evidence.

The court overruled the motion, to which opinion exception was taken, and the case comes into this court.

*W. R. Miles* for plaintiff in error.

The plaintiff in error was indicted for murder in Madison county. A change of venue was prayed for, and the trial took place in Yazoo. He was found guilty. A motion was made for a new trial, because,

I. The court erred in suffering illegal testimony to go to the jury.

II. In granting the 7th, 9th, and 11th instructions asked for by the state.

III. In refusing to grant the 4th, 5th, and 6th instructions asked by the defendant; and,

IV. Because the verdict was contrary to the evidence.

1. That the court erred in admitting Gillespie's evidence is quite plain. He was called to speak of a dividing line, running from east to west, through a section of land, midway between its external boundaries. He stated that, in order to find the starting point, he had commenced at the north-east or south-east corner of the section, and run half a mile. From that point he had run due east; that in measuring the half mile he had no personal knowledge of the distance travelled, and put his stake down at the point where the chain-bearer said it should be.

This is all believed to be hearsay evidence of the broadest kind. All he knew he derived from others. · He does not know whether they gave him true or false information. And if the chain-bearers spoke falsely in 1837, when they indicated the half-mile point to the witness, although that false information might have cost the plaintiff his life, the witness would not be answerable to the charge of perjury. The law as laid down

by elementary writers, and adjudged cases, requires the witness to speak from his " own knowledge ;" and I am not aware of any exception to this universal rule in favor of " surveyors."

It is now said by the state that Gillespie's evidence, even if wrongfully admitted, furnishes no ground for reversal; for that the question of title to the ground on which the fence stood does not connect itself with the guilt or innocence of the plaintiff. But this is not true.

If, therefore, Gillespie's evidence had been excluded, there would have been no testimony in regard to the ownership of the fence, except the survey of Holliday, which gave it to Lambeth. And the jury might, and in all probability would have acquitted, or at least reduced the offense to manslaughter. For there is scarcely a man in this state who would not shoot down another who was forcibly tearing down his fence and moving it off his land.

It has been a matter of grave doubt, whether the court can instruct at all at the instance of the state. For as the jury in criminal cases are judges of both the law and the fact, and may at their election acquit against the instructions of the court, it would seem to follow that the court had no power to instruct them for the purpose of procuring a conviction. For if the court have a right to instruct, it is a legal right. If it be a legal right, the court has power to enforce obedience. But we know the jury may, and often do, acquit against the instructions. In such cases the court has no power to enforce its decision on the instructions; and it therefore follows that the court has no right to give them.

Supposing, however, the court pursues the right, I submit that it has not propounded the law correctly on the seventh, ninth, and eleventh instructions. In the seventh instruction, the court tells the jury among other things, that they are " to compare it (the testimony of Israel and James Mayfield) with the testimony of other witnesses, and the facts established in the case," etc. Now what does this mean? So far as the comparison of their testimony with that of other evidence in the case is concerned, I make no objection. But what is meant when the jury are told to compare the testimony with the " facts established in the

case ?"    What were the "established facts of the case ?"    I had thought the jury had been empanelled for the express purpose of "establishing the facts of the case."    Now, until the verdict was returned, it would seem that they remained unestablished. The testimony of the Mayfields and that of the principal witness on the part of the state stood opposed, and that upon the most vital and important points.    An effort had been made to discredit their testimony.    Their good character for truth had been attacked by seven and sustained by twenty odd witnesses.    Standing thus opposed by the state's principal witness, standing thus attacked, and sustained, and the question being who was to be believed, the Mayfields or Rollins, the court informed the jury that it was their duty not alone to compare all the testimony, and determine what weight was due the evidence on both sides, but also to compare the testimony of the Mayfields with that of Rollins, (whose testimony constituted the "established facts of the case,") and then decide upon the weight to be given to each.    In other words and in plain English, the jury were told that there were certain "facts established in the case" by the state ; that these established facts admitted no contradiction ; that though they might wish to credit the Mayfields, they could not do it, for that would be to destroy the effect of the "established facts" proved by Rollins ; and they must therefore believe Rollins, first, as having "established the facts of the case ;" and then, secondly, disbelieve the Mayfields because they did not believe with him !

I. It violates that clause of the constitution which gives the accused the right to be confronted by the witness against him.

II. It instructs upon the weight of testimony, etc.

III. It is not law, if the 1st and 2d objections to it should be overruled.

1. Upon this point I need only refer to the constitution.    Its language is too emphatic and direct for argument.    U. S. Const., art. 8, sec. 6 ; Miss. Const., art. 1st, sec. 10.    This is in direct conflict with the common-law rule, allowing death-bed declarations to be read in evidence.    They cannot both stand together. One must give way.    Which shall it be ?    The constitution or the common-law rule ?    We shall see.

2. It is a direct instruction upon the weight of testimony. The jury are told exactly how much "credit and force" they are to give to Tate's dying declaration. They have no discretion at all. If the state meant any thing in asking an instruction upon the "credit and force" of testimony, it must have been what the language implies. Is not the force of the testimony and the weight of the testimony the same? Testimony has force according to its weight, no more, no less; without weight, testimony has no force. With little weight, testimony has little force. And with great weight testimony has great force. To instruct the jury, therefore, that certain testimony is entitled to the same "credit and force" as certain other testimony, the credit and force of which is fixed, is palpably to instruct upon the weight of testimony. It is for the court to decide upon the admissibility of the evidence; it is for the jury, under the circumstances, to judge of the effect of it. 2 Starkie, Ev., 460 [edition of 1830]; 1 Greenl. Ev., 191, § 160.

3. Independent of the foregoing reasons, the instruction is fatally erroneous.

Supposing the dying declarations of the deceased to be competent, it does not follow that they are entitled to the same weight, credit, or force, as other testimony regularly given in court. On the contrary, it has always been held, until this case, that they are not. They want several important additions to bring them up to the common level of testimony regularly sworn to in court. The common law makes such declarations competent. The rule is, that the sense of approaching dissolution is substituted for an oath, inasmuch as it is supposed a man *in extremis* will not speak falsely. Roscoe's Crim. Ev., 22.

But the obligation of an oath is not the only thing necessary. Not only the truth, but the whole truth is required. An examination in chief of a witness, although bringing out the truth so far as the witness speaks, not unfrequently leaves half the truth untold. This is well understood; and is matter of every day experience. And hence it has been well said, that a searching cross-examination is quite as important to get at the whole truth as the sanctity of an oath. 1 Greenl. Ev., 192, § 162; 2 Stark. Ev., 460 (ed. of 1830); 13 S & M. 507.

In all the authorities cited, it will be seen that this class of testimony stands on ground peculiar to itself, and falls far short of testimony rehearsed in open court. It is incomplete. It is subject to be greatly biased by feelings of anger or ill-will, and lacks the great essential of a cross-examination; and is therefore to be received with great caution. 1 Stark., 101 (ed. of 1830].

A single remark will dispose of the 11th instruction granted for the state.

No judge or writer of any reputation has ever held, that the law "presumes" death-bed declarations to be made under a "solemn and religious sense." No respectable authority sustaining this instruction can be produced. It is, therefore, a manifest interpolation upon the law.

The 4th instruction asked for by the defendant ought to have been granted; it propounds the law correctly and was predicated upon testimony before the jury. By refusing it, the court told the jury, that even if they should believe the Mayfields (upon whose testimony this instruction was founded), they must still convict the defendant.

Upon defendant's 5th instruction, which was refused, I only ask that the court will compare it with the authority, 1 Greenl. Ev., 192, § 162. If the 6th instruction does not state the law correctly, I have read law to little purpose. The refusal to give it was an error the most gross and flagrant.

The court gave an instruction instead of defendant's 5th; and also one as a qualification to defendant's 6th.

I am not disposed to quarrel with the instruction given in lieu of the defendant's 5th, as not being good law. I admit it to be sound so far as it goes. But it stops short at asserting a general rule denied by no one, and does not touch the principle asserted in the defendant's instruction.

The misnamed "qualification" of the defendant's 6th is utterly objectionable. As a "qualification" it might do very well. But the learned judge first refused the rule as asked by the defendant, and then, with great judicial gravity, "qualified" it.

For all these reasons, I think the verdict should be set aside, and a new trial granted. The admission of Gillespie's evidence;

the instructions granted for the state; the refusal of those asked for by the defendant; each and all, are erroneous.

But, independent of all these reasons, the verdict is contrary to the evidence, and a new trial should be granted on that ground.

I do not mean that there is no evidence to support the verdict, or that it is palpably against the evidence; but I insist it is against the preponderance of testimony (the "reasonable doubt" included), and should not, therefore, be permitted to stand.

In connection with this point, I ask the court to reconsider its decision in the case of Cicely v. State, 13 S. and M., 213, wherein the rule is made the same in criminal as in civil cases. With great respect, I submit that the law, as settled in that case, is erroneous, and should be corrected.

The authorities referred to in 13 S. & M., 213, are all civil cases, and therefore furnish no rule for a criminal case.

But the cases cited and relied on by the attorney general, in Nelm's and McCann's cases, in the same volume, are of a somewhat different character, and require a brief notice.

The case of The State v. Jeffreys, 3 Murph. N. C. R., 480, is the first in point of time. What is there said upon the point is but a dictum of the court, no new trial having been asked for.

State v. Sims, 2 Bailey S. C. R., 29, is the next in point of time; and in that case the whole opinion is so plainly against the law, as to strip it of all weight and respect.

McCune's case, 2 Rob. Va. R., 772–790, follows next in date, and then, although the indictment was for murder, the jury reduced it to the second degree, and it, therefore, ceased to be a capital case, and the rule as to reasonable doubts could not apply.

Hill's case, 2 Grattan Va. R., 603, was a capital case, and the court relied entirely on the opinion in McCune's case for authority, and here is a palpable departure in principle.

The case in 1 Kelly R., 618, was for larceny; and the one in 7 Blackf. 198, for rape.

It will thus be seen, that out of all the authorities cited, there is but one capital case, where the point was directly made and

decided, and that is made to depend upon an authority not in point.

It follows that, if the jury are bound to acquit upon a " reasonable doubt," it is also the court's duty to grant a new trial, if they convict over a reasonable doubt. Can any man peruse this record without a reasonable doubt of the defendant's guilt?

Simms had loaded Tate's gun at his request, and when afterwards requested to put down his gun by Mayfield, and settle the matter without its going any further, he replied, he "did not know how " else it could be settled.

Tate was never known to carry a gun or weapon before. At this time he was armed with both gun and pistol. He saw Lambeth and the Mayfields approaching him, and with his gun on his shoulder went directly where Lambeth was; and this, too, within a short time after hot and angry words had passed between Lambeth and himself. Rollins, the state witness, makes one statement, the two Mayfields make a different statement. Dr. O'Leary's testimony in regard to the wound sustains the Mayfields and contradicts Rollins. The credibility of the Mayfields was attacked by a few witnesses, and sustained by a great number. Their testimony would certainly acquit Lambeth, as would that of Rollins alone, certainly convict him.

In the face of all this, how is it possible for any man to say, there is not a " reasonable doubt " of the guilt of the accused.

*D. C. Glenn,* attorney general.

1. The evidence fully sustains the verdict of the jury. The evidence of Rollins and the declarations of Tate make a clear case of murder. In much of the statements of each they entirely coincide, are partially borne out by the other state witnesses and witnesses for the defense, the position of the ground favors the truth of what they swear, and such part of the defendant's proof as conflicts with theirs, is confused, improbable, and unworthy of belief.

It is clear that Lambeth found Tate moving his fence, ordered him to stop, and threatened him if he persisted. Tate did persist. Lambeth went home, saying he would get the boys and stop him. The Mayfields were soon summoned, and came. Caps were burst and guns fired as a " preparation " to force

Tate to desist. Soon Lambeth, armed with his gun, and the boys, re-appear. The boys go to Tate, and Lambeth makes his way to the shelter of a wood at the northeast corner of the Shular field, near where the negroes were at work. Much conversation ensued between the boys and Tate. They swear that they preached peace to Tate, begged him to give up his gun, and promised him to take Lambeth's gun from him if he would. Tate says they were only seeking to disarm him, which he refused to permit. The probability of the truth of either statement is well determined by a single reflection. If the Mayfields desired peace and fair play and to settle the difficulty amicably, why did not they first disarm their friend and brother-in-law, Lambeth? This they could easily and should have done. But how was it? The removal of the fence was the *casus belli* of the parties. Right where this was going on they station Lambeth, armed with his gun. They then, two of them, friends of Lambeth's, brothers-in-law, who had been summoned by him for the fray to the scene of action, approach Tate and ask him to surrender his means of defense, in the face of the man who had threatened him. The belief is far more reasonable that they were seeking to lull Tate's vigilance, to throw him off his guard and to disarm him, so as to place him at the mercy of Lambeth.

The accounts which the Mayfields give of the actual shooting is confused and unintelligible to me, and is contradicted by the position of the ground and the proof of all the witnesses. They saw Tate cock both barrels of his gun; presented it, and took his position by a tree; that he sat his gun on the left side of a tree; this was the north side. Lambeth was leaning his left side against his tree, which, of course, made him face south, looking west and south at the parties. Tate, they say, seemed to be drawing back his gun from the left to the right side of the tree, and in so doing, stepped back some two feet, which exposed him to Lambeth, who moved around to the left of his tree and fired. Is this probable or natural? If Tate sought the tree and reached it, and placed his gun on the left hand side of it, would he have been crazy enough to have drawn back his gun, and stepped out two feet in the clear to the right, when his

adversary was on the same side ready to shoot? This voluntary and most unnecessary exposure of himself by Tate is a trick of the Mayfields; it was intended, as far as could be, to meet and satisfy the proof of the wounds which show all the shot in the right side running diagonally towards the spine; the probability is, that Lambeth was on the left of his tree the whole time, for the reason that he could not fire from the right side, unless he exposed his whole body, while on the left he was almost unexposed. There he stood, and from thence he fired, as Tate ran, the shot running southwest from side to spine. This seems credible, and was the fact, as Tate and Rollins swear. If the Mayfields say truly, Tate was a raving maniac. Warned of his danger, to advance one hundred and fifty yards with his gun cocked and presented in a threatening manner, in the face of an armed man under the protection of a tree, and who, he was told, would shoot him; then himself seek cover of a tree, to set down his gun, and then, for no reason that can possibly be assigned, under the eye and in the reach of an enemy, armed and seeking his life, he surrenders the cover he had found, steps out, and permits himself to be shot down, with his gun in his hand, and it not even raised! This is rather too much; like the fish story, it throws discredit over all their statements. Now, it is clear that the Mayfields, in their evidence, posted Tate's gun on the left of his tree, just to make him pull it over to the right, in order to give plausibility, to afford some shadow of excuse for his stepping backward two steps, and letting Lambeth kill him. The truth is, that if Tate had got to the tree, as stated, the natural place for his gun was the right side, and from that side he could fire, and at no exposure, just as Lambeth's proper place was the left side of the tree. But the whole statement is awkward, and bears the mark of perjury on its face, and besides is disproved by Tate and Rollins, who swear positively, and whose account is reasonable and true.

But the deed is done. Tate is shot; he lies "pale, ghastly, and weltering in his blood." Rollins, affrighted, calls for aid. He implores help from the Mayfields. Where, now, are the peace-makers who but now were so friendly to the dying man?

Do they offer the sympathy which so unhappy an event called for, even admitting that poor Tate was wrong? Nothing of the kind; their work was finished. Silently, but naturally, the confederates came together again, and swiftly sped them from the scene of their murder. If the deed was justifiable, there were the Mayfields to prove it, ready and on the ground. Why not wait, why not face their friends and neighbors, and say, it is a sad affair, but necessity required it? The instinct of truth would so have irresistibly held them; but not so; an inward monitor spake of guilt, of a planned and preconceived murder; their victim was before them in his blood; conscience whispered, and suddenly they left, as the Scripture hath it "The wicked flee when no man pursueth;" 'tis the sound of the driven leaf that scareth them.

The credibility of the Mayfields was strongly assailed by the state, and well sustained by the defense. On that point "honors are easy." The proof of Tate and Rollins was not assailed.

I shall reserve further comment on the testimony for an oral argument. Thus much has been said to show the verdict was borne out by the evidence.

2. I have shown the evidence supports the verdict. I therefore invoke the application of the rule so solemnly laid down by this court, which is sustained by authority, and borne out by principle, that this court will not disturb the verdict unless it is palpably against the evidence, or manifestly without evidence. McCann v. State, 13 S. & M., 497; Cicely v. State, ib., 213.

3. It is held to be a maxim of law, that it is peculiarly the province of a jury to determine in cases where there is a conflict of testimony. Such is here the case. If Tate and Rollins are to be believed, Lambeth is guilty. If the Mayfields, he is not. The jury have discredited the latter, and found him guilty. This is an additional and powerful reason why the verdict should not be disturbed. Keithler v. State, 10 S. & M. 228; Whart. Am. Crim. Law, 643, and many authorities cited.

4. Is there any error of law in the proceedings?

The 1st, 2d, 3d, 4th, 5th, 6th and 8th charges on the part of the state were not objected to, and no objection can now be

raised.   The 10th was refused.   So there only remains of state charges the 7th, 9th and 11th.

Charge 7th only asserts the well known power of a jury to compare and weigh testimony, and give it such weight as it may be entitled to. Coon v. State, 13 S. & M., 262 ; McCann's case, ib., 497 ; Ciceley's case, ib., 213.

Charge 9th simply asserts, *in hæc verba*, the rule laid down by the chief justice, " that the awful situation of a dying man is supposed to be as powerful on the conscience as the obligation of an oath." Nelms v. State, 13 S. & M., 506.

Charge 11th is but the sense and spirit of the case just cited, and of all law on the subject of dying declarations.  Ib.

The 1st, 2d, 3d and 6th charges for defendant were given. No question arises on them.

Charge 4th was refused.   The facts, in part, are imaginary; in some portions, are true; these are mingled together, and with the facts are then bundled into law by scraps in such a way as to confuse and mislead a jury.   The gist of the charge is clearly embodied in the 1st, 2d and 3d charges given.   Just so in McDaniel's case, 8 S. & M., 419.   In regard to the 5th, 6th and 7th charges, these were refused, and refusal sustained by Mr. J. Clayton.  See 2 Stew. & Port., 193 ; 1 Greenl. R., 135 ; 4 Chit. Gen. Pr. 40 ; 4 Hamm., 389 ; 1 Denio, 524 ; 7 J. J. Marsh, 194.

Charge 5th, qualifying defendant's, is not law, or if so, it is so stated as to mislead.   It is qualified in the very language and plain sense of charge 9, in Nelm's case, 13 S. & M., 506.

Charge 10th, qualifying state, and 6th defence.   Either of these charges may be law ; still the judge has a right to refuse, so he give the law in another form.

A circuit judge is not bound to give charges in the exact language asked, but may modify them in conformity with his own views of the law. Boles v. State, 9 S. & M. 288.

The right under the Act of 1846 is again asserted in the Keithler case, 10 S. & M., 227 ; and finally in Ciceley's case, 13 ib., 210, the very modification of the very charge in hand was given and was sustained.

Lastly.   The objection to Gillespie's proof was properly overruled.   The testimony of any surveyor or other public officer,

as to acts which the law makes it his duty to perform, is con-
clusive. If this objection was good, no survey could ever be
proven. I cannot see much importance in it any way. No
matter to whom this fence belonged, a trespass in moving it did
not justify a killing. McDaniel v. State, 8 S. & M. 419.

Fully as I have looked into this case, I can see no error in
law or of fact which authorizes the defendant to ask for a rever-
sal. Not often does justice, in this our day and time, reach
high offenders against the criminal laws of the land. When it
has done so, as in this instance, after long and earnest investi-
gation, a fair and impartial trial, the rights, safety and interests
of the many appeal as powerfully to the court as the misfortune
of the accused.

Surely in this case has justice been fairly done in all things;
so must the defendant bide his doom and answer the offended
laws of his country.

*A. H. Handy*, on same side.

I. The testimony of Gillespie was properly admitted, because,
1. The prisoner had offered evidence in the first instance, in
relation to the subject matter, in his cross-examination of the
witness Rollins, with a view to disparage Tate. He could not
object to further testimony on the same point to which he had
opened the door. 2. Gillespie's testimony as to the survey and
bounds of the land is not hearsay evidence, so far as the meas-
urement was reported to him by the chain-bearers. He was
acting as county surveyor, in his official capacity, and the chain-
carriers were persons recognized by law, whose sworn duty it
was to report the distances as measured. Their reports to the
surveyor, during the survey, were part of the *res gestæ*, and there-
fore original evidence. They were official acts, and therefore
presumed to have been done correctly. So of the survey itself,
which could be made only by the aid of the chain-bearer. 3.
But even if improperly admitted, all prejudicial effect of it was
prevented by the 6th instruction given at the instance of the
state, which, in effect, told the jury to disregard all this evi-
dence. The question was not one of property, for all such evi-
dence was inadmissible for such purpose. 8 S. & M., 419. But
the point of the evidence was to show unjustifiable conduct on

the part of Tate in claiming the land.   It was a question of motive and provocation to which the question of property was merely collateral, and that being introduced first by the prisoner, it was certainly proper to show the reason on which Tate acted.   And to that extent alone was the testimony admissible in any point of view.

II.  The 7th instruction at the instance of the state is clearly law.   1 Stark. Ev., 580, 581; McCann v. State, 13 S. & M., 471 ; Cicely v. State, ib., 202; Coon v. State, ib., 252.

So the 9th instruction.   1 Greenl. Ev., § 157–160 ; Rosc. Cr. Ev., 34 ; Whar. Am. Cr. Law, 179 ; 13 S. & M., 506 ; 8 ib., 419.

So of the 11th instruction at the instance of the state.   The dying declarations had already been received and admitted as evidence by the court.   The question of admissibility was a preliminary one for the court.   After that had been settled by the court, it is presumed  that the preliminary proof, on which alone such declarations could have been admitted in evidence, had been made, and then the only question for the jury was as to their weight under the particular circumstances of mind, feelings of anger, revenge, or, on the contrary, of calmness, justice, etc., etc., in which the defendant was, at the time of making them.   1 Greenl. Ev., § 160 ; Whart. Am. Cr. Law, 179.

These instructions, together with the qualifying instruction given by the court, placed the whole subject of the dying declarations and their weight fully and properly before the jury.  And the 5th instruction asked by the prisoner was unnecessary, and calculated to embarrass and mislead the jury.   That instruction submitted to the jury the preliminary question already decided by the court, and left the question of what was a " religious sense " of impending dissolution to the uncertain, and possibly conflicting and irreconcilable opinions of the jury.   That was a question of law already decided by the court.   There was no evidence of Tate's religious belief.   And the presumption of law in this land and age of christian enlightenment is, that every man is a believer in the fundamental principles of the christian religion, a future state of accountability, and of rewards and punishments.

Then, no injury could have been done by the refusal of this instruction asked by him, because, in addition to the general rule given at the instance of the state, all the circumstances under which the declarations were made, were fully submitted, to be weighed and considered by the jury, by the instruction given by the court in its stead, and in qualification of the instructions given at the instance of the state.

III. The 4th instruction asked by the prisoner was properly refused. So far as it could properly have been given, it was fully covered by the 1st, 2d, 3d, and 7th instructions given at his instance. These instructions contain a full expression of the law operating to his justification. The court was not bound to give instructions in every variety of form suggested by counsel. If the law was substantially and plainly given, it was sufficient. Cicely's case, 13 S. & M., 210; Keithler's case, 10 ib., 227; Boles' case, 9 ib., 288; 10 ib., 25.

This instruction is fully covered by the other instructions given for the prisoner, unless it was intended to convey the idea that Lambeth had a right to shoot Tate, if Tate was merely going with his gun on his arm or in his hand, in the direction where Lambeth was, and knew that Lambeth was there, it being near where Tate's negroes were at work and where he was obliged to go in superintending them. This seems to be the bearing of the charge, and if so, it was properly refused. It was, at all events, of doubtful import, and calculated to mislead and embarrass the jury. So far as it was not already covered by the 1st, 2d, 3d, and 7th instructions for the prisoner, it is erroneous, and should not have been given; and so far as it is embraced by these or other instructions, it is superfluous and was properly refused. 10 S. & M., 25.

The 5th instruction asked by the prisoner and refused, and the 10th instruction asked by the state and refused, should undoubtedly have been given. But the instruction given in lieu of them, fully embraces everything contained in them. It fully and clearly recognizes the principle that the prisoner is entitled to the benefit of all reasonable doubts, and defines what such reasonable doubts are in law. The instruction is in the very language in which the rule is laid down in Cicely's case, and it

is not possible to conceive but that it conveyed to the minds of the jury a clear and distinct idea of the rule, that the prisoner should have the benefit of all reasonable doubts resting upon their minds from the evidence. Although the instruction, as given, does not positively state this rule, yet it so clearly and fully recognizes it in stating the proper qualifications to it, as to place the rule itself as distinctly before the mind as the most positive statement of it could do. And it would, indeed, be strange to hold that the court below erred in giving the law to the jury, under like circumstances, in the very terms in which it is laid down in this court.

As to the court's instructing the jury on the weight of evidence in the state's 11th instruction, the court simply declares the presumption of law arising from the dying declarations which have been admitted in evidence. And the authorities fully sustain this instruction to this extent. Whar. Am. Cr. L., 179 ; 1 Greenl. Ev., § 160. But even if this instruction stated the rule as to the dying declarations too strongly, all possible prejudice to the prisoner was prevented by the qualifying instruction given by the court, which left the weight and influence of the dying declarations entirely to be considered by the jury. 2 S. & M., 17.

The points insisted on, that dying declarations are not admissible in criminal cases, in virtue of the 10th section of our bill of rights, and of the 6th amendment to the Federal Constitution, which guarantee to the prisoner the right to be " confronted with the witness against him," and that the jury are the conclusive judges both of law and fact in criminal cases, need no reply except a reference; on the first point to Woodsides v. State, in this court, 2 How., 264, and on the second, to the opinion of Judge Story, in United States v. Battiste, 2 Sumner, 240.

YERGER, J.:

The plaintiff in error was found guilty in the Yazoo circuit court of the murder of John Tate. He seeks to set aside that verdict, and reverse the judgment upon several different grounds. In stating the result to which our minds have come, it will not be necessary to notice all the evidence in the cause or all the

points made by counsel in behalf of the accused. Such evidence only will be referred to as may be necessary to elucidate the points decided by us. Darling Rollins was the first witness introduced in behalf of the state, and from his testimony it appears, that a dispute had arisen between the deceased and the accused, in relation to the boundary line between their respective tracts of land; and that during the day on which the slaves of the deceased were engaged in removing a fence situated on the disputed land, he was shot by the accused, and died from the effects of the wounds. Upon his cross-examination the witness stated, that Tate had previously told witness, that R. J. Holliday, then surveyor of Madison County, had run the dividing line between Lambeth and himself; and that by that demarkation and line, the fence in dispute was left on Lambeth's land, but that in the same conversation he had further stated, that he did not believe Holliday's line was correct, because Gillespie, in 1837 or 1838, had surveyed the same land, and by his survey the fence in dispute was on Tate's land. Gillespie was subsequently introduced by the state and proved, that in 1837 or 1838 he did run the dividing line between the tracts, and by that survey the fence in dispute was on Tate's land. Before Gillespie's testimony was given, a preliminary question was asked him by the counsel for the accused, namely, whether he had any personal knowledge of the length of the lines run by him in that survey. To which he replied, that he knew nothing of the distance of any of the lines, except what he learned from the chain-carriers, who were sworn chain-carriers; and he did not know, whether, what they told him, was true or false. Defendant's counsel then objected to his testimony in relation to the survey made by him, but the objection was overruled, and the testimony admitted, and the admission of this testimony is assigned as error.

During the progress of the trial, John Simms was introduced as a witness by the state, and proved that on the 3d of April, 1850, the day on which Tate died, witness was with him; that Tate was then in full possession of his mental faculties, and while in that condition, and when satisfied that he was about to die, he made a declaration in regard to his murder, which was

reduced to writing at the time by the witness. The statement was then given in evidence without objection. After the testimony closed, many instructions were asked for by both parties, and several on both sides given and some refused. Among others given in behalf of the state, the defendant excepted to the 9th and 11th instructions, and the giving of those is assigned as error.

The court refused to give the 5th and 6th instructions asked for by the defendant's counsel, but gave others in lieu of them, and this is likewise alleged to have been erroneous.

During the argument of this case, the objection to Gillespie's testimony was earnestly pressed upon the court. We confess we cannot view this point in the same light with the prisoner's counsel. In the first place, we may remark that the guilt or innocence of the accused is in no degree dependent upon the question of his or Tate's title to the land or fence in dispute between them. Had Lambeth attempted to remove the fence, the law would not have excused his homicide by Tate in preventing the removal, although the fence were the rightful property of Tate; of course the converse of this proposition is equally true. If either killed the other with a deadly weapon, in order to prevent a trespass in the removal of the fence, such homicide would be murder, in the absence of proof that would tend to rebut the presumption of malice arising from the weapon used; and in the absence of such proof, the kind of weapon used determines the intent, and fixes the degree of guilt.[1] McDaniel v. State, 8 S. & M., 418. Hence, in considering the questions of the guilt or innocence, the correctness of Gillespie's survey, or whether he knew it or not to be correct, is immaterial. If his testimony had been offered in a suit about the boundary of the land, we are not prepared to say that it should have been rejected. It is true, he stated that he knew nothing of the length of the lines, except from the statements made at the time of the survey by the sworn chain-carriers. The survey was made by Gillespie, and the length of the lines fixed by him in the same manner that other surveys are usually made, and the

[1] Wharton on Homicide, 233; 1 Hale, 473, 486; 1 East P. C., ch. 5, § 58, p. 289; Archbold Cr. Pr. & Pl., 846, notes; ib., 805; Foster, 291.

length of lines determined.   He had the same knowledge of the distance run by him that surveyors generally have.   The mode adopted by them in surveying land, is to put down the distance as it is communicated from time to time by the chain-carriers, and these statements, made at the time of the survey, would seem to be admissible when referred to by the surveyor, rather as a part of the *res gestæ* of the survey, than as hearsay evidence of statements by the chain-carriers.

But Gillespie was not introduced to prove Tate's title to the land in controversy, or the correctness of the survey made by him.   On the cross-examination of Rollins by the defendant, he stated, that Tate had said the dividing line between Lambeth and himself had been run by Holliday, by which survey the fence in dispute was on Lambeth's land; but that he did not believe that survey was correct, inasmuch as Gillespie had previously surveyed it, and by his survey it was on Tate's land.   It was competent, after this testimony was given on cross-examination, to introduce Gillespie as a witness, to prove the fact, that he had made the previous survey, as stated by Tate.   And in this point of view, we think the evidence was admissible, whether the survey was correctly made or not.

Secondly.  Did the court err in giving the 11th instruction asked by the state.   It is in these words, " The presumption of law is, that the declarations of Tate, made when he believed he was about to die, and shortly before his death, were made under a ' solemn and religious sense' of approaching dissolution, and the jury must consider said declarations as made under such sense, unless the contrary is proved."   By our law, the dying declarations of a party are only admissible on a trial for homicide, where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the dying declarations.   A preliminary fact, essential to be proved before their admission is, that they were made under a sense of impending dissolution. [1]   This preliminary proof, and the proof of the

[1] 1 Archbold Cr. Pr. & Pl., 449; 1 East P. C., 354, 358; Rex v. Woodcock, 1 Leach, 652; Rex v. Wilborn, 1 East P. C., 358; Rex v. Van Butchell, 3 C. & P., 629; Com. v. Williams, 2 Ashmead, 69; 1 Greenl. Ev., 158; 2 Russ. on Crimes, 752; Hill's case, 2 Grat., 594; Nilson v. State, 7 Humph., 542; Moore v. State, 12 Ala., 764; Brakefield v. State, 1 Sneed, 215; Starkie v. People, 17 Ills., 17; Robbins v. State, 8

circumstances under which the declarations were made, are to be shown to the judge, who is the exclusive judge of their admissibility, in the same manner as the preliminary proof of documents and the competency of witnesses is always addressed to the court.[1]  1 Greenl. Ev., § 156, 160.

The awful situation of the party making the declarations and his belief in his immediate and impending dissolution, are considered by our law as equivalent to the sanction of an oath.[2] If the declarant, by reason of infancy, or imbecility of mind, tender age, or a disbelief in a future state of accountability, would have been excluded as a witness while living, his dying declarations would, for like causes, be rejected by the court. An oath derives the value of its sanction from the religious sense of the party's accountability to his Maker, and the deep impression that he is soon to render Him his final account. The danger of immediate and impending death, and the belief of the party therein, is, by our law, considered equivalent to this sanction. It follows as a necessary consequence of the rule which admits dying declarations made under such circumstances, that the law must presume them, in the absence of proof to the contrary, to have been made under "a solemn and religious" sense of impending dissolution; that is, under a serious sense, that the party would be soon called to account for the truth or falsehood of the statements, in the same manner as the law will presume, in the absence of evidence to the reverse, that every witness placed upon the stand and sworn to testify, believes in the existence of a God and a state of accountability in the future, for the commission of crimes perpetrated here. 1 Greenl. Ev., § 157. In this connection it is proper to notice the action of the court in overruling the motion for the defendant's 5th instruction, by which the court was requested to charge the jury, that unless the dying declarations of Tate were deliberately

Ohio St. R., 131; Brown v. State, 32 Miss., 433; Kilpatrick v. Commonwealth, 7 Casey, 198; Commonwealth v. Densmore, 12 Allen, 535; Rex v. Pike, 3 C. & P., 589; Rex v. Crockett, 4 C. & P., 544; Rex v. Hayard, 7 C. & P., 187; Montgomery v. State, 11 Ohio, 424; State v. Poll, 1 Hawks, 442; Dunn v. State, 2 Pike, 229.

[1] See cases cited in note * supra.

[2] Archbold Cr. Pr. & Pl., 449; 1 East P. C., 354; 2 Russ. on Crimes, 752; Wharton Am. Cr. Law., 669; 1 Greenl. Ev., 158.

made under a "solemn and religious sense" of impending disso-
lution, they were entitled to but little weight.

We have just attempted to show, that where the court has ad-
mitted the "dying declarations," as competent evidence for con-
sideration of the jury, the law raises a presumption, that they were
made by the party in a state of mind indicated by this instruc-
tion ; unless the court was satisfied that they were made so, it
would have been his duty to have excluded them from the jury,
and not permitted them to have any weight in the formation of
the verdict.    The competency of this kind of testimony we
have before seen, was exclusively for the consideration of the
court.   Having once decided that it was competent that the
party was in the frame of mind required by the law, to author-
ize the admission of his dying declarations, the power of the
court over that question was determined.   It then became the
province of the jury to decide upon its credibility, who were at
liberty, in doing so, to take into consideration all the circum-
stances under which the declarations were made, including those
already proved to the court, and to give to the evidence only
such credit or force as, upon the whole, they might think it de-
served.[1]   1 Greenl. Ev. § 160.   We are of opinion, therefore,
that the court did not err in refusing defendant-in-error's 5th
instruction.

Again, will this court reverse the judgment because the cir-
cuit court refused to give the defendant's 6th instruction ?  That
instruction was in the following words: "If from all the evi-
dence the jury entertain any reasonable doubts of the guilt of
Lambeth, they cannot find him guilty, but must acquit him."
As a legal proposition, this instruction was certainly correct,
and we are at a loss to ascertain an adequate reason inducing
the judge to refuse it.   On its refusal, the jury were in-
structed in lieu of it, that "To warrant the jury in finding the
defendant guilty, there should be evidence before them sufficient
to satisfy their minds beyond a reasonable doubt.   That which
amounts to mere possibility, or conjecture, or supposition, is not
what is meant by a reasonable doubt.   The doubt which should
properly induce a jury to withhold a verdict of guilty, should

[1] Vide cases cited supra.

be such a doubt as would reasonably arise from the evidence before them, and if such a doubt should arise from the evidence, the prisoner should have the benefit of that doubt." This instruction is in the precise language used by the circuit judge, in the case of Cicely v. State, 13 S. & M., 210. In that case, however, it was given by the circuit judge as an explanation of the words, "reasonable doubts." After he had given an instruction asked for by the accused, similar to that refused in this case, we think the court, in the case of Cicely v. State, adopted the safe and proper rule, that is, to give the instruction and afterwards to give the explanation, if it deemed that the instruction needed explanation. It is the safer course, and one which in criminal trials the circuit court ought to adopt, to give the instructions asked by the accused, provided the court believes them to be law, and if any explanations are needed in the opinion of the court, they can be afterwards given.

This brings to the consideration of the last proposition which we deem it necessary to notice in this opinion. Did the circuit court err in giving the 9th instruction asked for by the state? We think it did. That instruction was as follows: "That the dying declarations of Tate, written by the witness Simms and offered in evidence, are entitled to the same credit and force before the jury as if the statements had been regularly sworn to in court before the jury." In connection with this point the counsel for the prisoner elaborately argued that the dying declarations of the deceased ought not to have been admitted, because the admission violated the 10th article of the bill of rights, which declares that in all criminal prosecutions "the accused shall be confronted by the witnesses against him;" and we have been earnestly invoked to review the former opinions of this court on this question. It would probably be sufficient to state in reply that these declarations were admitted without objection, and, therefore, it is too late to make it in this court for the first time. If, however, the objection had been made in the court below, it would in our opinion have been wholly untenable. This view of the law has been so often held by the courts of other states, having clauses in their constitutions similar to that in our bill of rights, and this court has decided so re-

peatedly that these declarations are admissible, even if our minds could be brought to doubt upon this point, we would not feel at liberty to disturb a principle so often settled and acquiesced in for so long a time. In Woodside *v.* State, 2 How. R., 665, decided in January, 1837, this question was fully discussed, and in an elaborate opinion delivered by the present chief justice, this objection to the dying declarations was pronounced untenable, and the admission of them was held in no wise to conflict with the bill of rights. If this were a new question, now arising for the first time, we could not entertain a doubt of the correctness of the principle as now settled. The admission of these declarations was established as a rule of evidence by the courts of the common law, are almost coeval with the foundations of that law itself. The general principle of the common law, on the subject of evidence, with few exceptions, has always been that " hearsay evidence " could not be admitted. But simultaneous with the adoption of this rule, an exception was made to it in the case of the " dying declarations " of the deceased, on the trial of the party charged with his murder. This exception to the rule was made upon the ground of an overruling public necessity for preserving the lives of the community by bringing man-slayers to justice. It would often happen that there was no third person present to be an eyewitness to the fact, and the usual witness in other cases of felony is himself destroyed. 1 Greenl. Ev., § 156. When the bill of rights was adopted by the framers of our constitution, they were aware of this rule of evidence of the common law. They found it adopted into, and forming a part of the jurisprudence of our country. The object they had in view in adopting the clause referred to, was not to introduce a new, or abolish an old rule of evidence. Their intention was not to declare or specify the nature, character, or degree of evidence which the courts of the country should admit. Their aim was simply to reassert a cherished principle of the common law which had sometimes been violated in the mother country in political prosecutions, leaving to the courts to decide, according to the rules of law, upon the nature and kinds of evidence which a witness, when confronted with the accused, might be permitted

to give. The dying declarations are not the witness against the accused. They are only evidence against him which the witness confronted with him is permitted to introduce. The party testifying is the witness alluded to in the bill of rights. What testimony he shall be allowed to give is, in our opinion, regulated by the principles of the law and the practice of the courts, unaffected by the bill of rights.

But in our opinion the 9th instruction was erroneous because the language was calculated to mislead the jury in respect to Tate's declarations, which, under any circumstances, are at least but hearsay testimony, and subject to the objections which apply to that kind of evidence; nothing but an imperative sense of public necessity ever justified their admission. Hence the courts constantly declare that they should be received with great caution. It is true, some authorities lay down the rule, that "A sense of impending death is equivalent to the sanction of an oath; and that the persons whose statements are thus admitted, are considered as standing in the same situation as if they were sworn."

In thus laying down the rule, nothing further was intended by the writers than to assert the ordinary principle of the law on this subject, to wit: that for the purpose of admitting these statements to the consideration of a jury, the law substitutes the situation of the party making them in lieu of the oath which is usually required, and so renders the evidence competent. But the degree or weight to be given to such statements is left for the consideration of the jury, and depends upon a variety of circumstances which may tend to increase or diminish them. Among these circumstances are the mental and physical condition of the deceased when the declarations were made; his memory, the extent to which disease may have impaired his recollection, and the accuracy with which the witness who testifies to the declarations, repeats the language used by the deceased. When statements are regularly sworn to in court before a jury, there are methods by which the jury can test the truth or falsehood of the statements, which cannot be applied by them to testimony given in any other way. Hence, the provisions before referred to in the bill of rights, that the accused shall be con-

fronted with his witnesses. In addition to the solemn sanction of an oath administered to the witness and which impresses him with the necessity of speaking the truth, as he will hereafter be held to account for it, there is a salutory and restraining fear of punishment for perjury if a false statement is made; and when the witness is thus confronted with the accused before the jury, the accused has the power of cross-examination, a power as essential to the eliciting the truth as the sanction of an oath itself, as thereby an opportunity is afforded to ascertain facts omitted in the statement which may be essentially important to the truth of the narrative. 1 Greenl. Ev., § 162; 2 Pothier on Obl., 255 (Mr. Evans' note); 2 Starkie's Ev., 263.[1] At the same time, from a personal observation of the witness, from his manner of testifying, from his willingness or unwillingness to answer questions, from the clearness of his statements or the hesitancy with which he speaks, the jury is called to judge of the truth of his statements, in a manner which gives a weight and force to testimony, which evidence given in no other way should receive.

If, then, the court, by the 9th instruction, intended to charge the jury, that the same weight and force was to be given to Tate's statements as if Tate himself had been a witness in the court, it was certainly erroneous; and whether such was the meaning of the court or not, the language used would bear such a construction, and the jury may have so considered it, inasmuch as Tate could not have regularly sworn in court before them in regard to these statements, except as a witness. But the instruction, in our opinion, is objectionable in another point of view. The jury is directed to give to the statement of Tate, written by Simms, the same degree of weight and force as if it had been made directly by Tate in their presence; thus giving to secondary evidence the same weight which is due to direct testimony. Although the witness Simms intended to communicate accurately the statements made to him by Tate, and the circumstances under which they were made, it is impossible for him to communicate the tone and manner of Tate in making

---

[1] See also Phil. & Ames on Evidence, 305, 306; 2 Johns., 35, 36; Rex v. Ashton, 2 Lewin Cr. Cases, 147, per Alderson, B.

these statements. It is impossible for the witness to do more than convey to the jury the impression made on his own mind at the time. Every day's experience teaches us that we cannot and ought not to rely with the same confidence upon what is communicated to us, as upon those things which we see and hear ourselves; nor are such statements entitled to the same weight and force, however anxious the informant may be to communicate accurately what he has seen and heard; he can only give the impressions that were made upon his own mind; and if, from any cause, that impression is inaccurate, is incorrect, he will, of course, make an inaccurate and false impression on the mind of the party to whom the communication is addressed. We do not think, therefore, that Tate's statements, written out and offered in evidence by Simms, were entitled to the same weight as if Tate had been regularly sworn in court before the jury; because, in the latter case, the jury could have judged for themselves, by personal observation, in relation to Tate's mental and physical condition, how much his mind had been affected by his wounds and impending death; to what extent his memory and recollection had been impaired thereby; how far the passion of anger or feelings of revenge operated upon his mind and affected the truth and accuracy of his statements. In short, they could have decided in regard to these things, by impressions made immediately on their minds, and not made mediately upon them by information derived from another. It is, therefore, our opinion, that the statement of Tate, if sworn to regularly in court, before the jury, would have been entitled to greater weight and force, than when communicated to them by the witness Simms. Let the judgment be reversed, a new trial granted, and the cause remanded.